## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IBEW LOCAL UNION 375, on behalf of Guidant Corporation an Indiana Corporation, | : : : | **CIVIL ACTION** |
| Plaintiff, | : | **1:03-CV-Nº1164 SEB - WTL** |
| | : | (Shareholder Derivative Action) |
| v. | : : | |
| | : | **JURY TRIAL DEMANDED** |
| RONALD W. DOLLENS, JAMES E. CORNELIUS, MICHAEL GROBSTEIN, MARK NOVITCH, EUGENE L. STEP, MAURICE A. COX, JR., NANCY-ANN DEPARLE, ENRIQUE C. FALLA, J.B. KING, SUSAN B. KING, J. KEVIN MOORE, REUDI E. WAGER, AND AUGUST M. WATANABE, | : : : : : : : : : : | |
| | : | **VERIFIED DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY** |
| Defendants, | : : | |
| and | : : | |
| Guidant Corporation, | : : | |
| Nominal Defendant. | : : | |

Plaintiff, by its undersigned attorneys, on personal knowledge as to itself and its own acts and on information and belief as to all other matters, based upon an investigation by plaintiff's counsel, alleges as follows:

### JURISDICTION AND VENUE

1.     This derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

2.      Plaintiff IBEW Local Union 375 is a citizen of the State of New York. Upon information and belief, each of the defendants is a citizen of a state other than New York. The nominal defendant, Guidant Corporation ("Guidant" or the "Company"), is a corporation organized under the laws of the state of Indiana with its principal executive office at 111 Monument Circle, Indianapolis, Indiana 46204-5129.   The amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332.

3.      This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have. Guidant is headquartered in this district and the Company and the defendants are subject to personal jurisdiction in this district.  Venue is proper in this district because some or all of the events, actions and failures to act giving rise to the claims asserted herein occurred in this district.

## PARTIES

4.      Plaintiff IBEW 375 is currently, and has been at all relevant times since before March 1999,  the owner of shares of the common stock of Guidant.

**Nominal Defendant**

5.      Guidant develops, manufactures and markets products and services that enable less-invasive care for some of the most threatening medical conditions.

**Individual Defendants**

6.      At  relevant times, Ronald W. Dollens ("Dollens") (director since 1994), James E. Cornelius (director since 1994), Michael Grobstein (director since 1999), Mark Novitch (director since 1995), Eugene L. Step (director since 1995), Maurice A. Cox, Jr.

2

(director since 1995), Nancy-Ann DeParle (director since 2001), Enrique C. Falla (director since 1995), J.B. King (director since 1994), Susan B. King (director since 1996), J. Kevin Moore (director since 1995), Reudi E. Wager (director since 1995), and August M. Watanabe (director since 2001) each served as a member of the Board of Directors of the Company during the period of wrongdoing alleged herein.

(a)     Defendant Dollens is, and  has been during the relevant period, President and Chief Executive Officer of Guidant.

(b)     Defendant J. B. King served as Vice President and General Counsel of Guidant during much of the relevant period and is of counsel to Guidant's law firm, Baker & Daniels.

7.     Each of the Individual Defendants owed Guidant and its shareholders fiduciary duties including the duties of care and loyalty which require that he/she act on an informed basis and exercise care in performing his/her duties.

8.     To discharge their legal duties, the Individual Defendants, inter alia, were required to exercise reasonable and prudent supervision over, and keep themselves informed of Guidant's senior management, policies, practices, controls and financial affairs which included, inter alia, taking necessary steps to ensure that adequate policies and reporting systems existed at Guidant and functioned properly to ensure that relevant federal government regulations under which Guidant operated were followed, that serious problems with Guidant's products, particularly where they involved the health of patients using Guidant products, were timely and properly reported and that all efforts were made to remedy and make full disclosure of patient injuries or deaths by reason of use of Guidant

3

products and to suspend or withdraw Guidant products from the market pending full examination of products causing serious patient injury or death.

## DEMAND FUTILITY

9.     Plaintiff brings this action derivatively in the right and for the benefit of Guidant to redress injuries suffered and to be suffered by Guidant as a direct result of the Defendants' breaches of fiduciary duty alleged herein.  Plaintiff will adequately and fairly represent the interests of Guidant and its shareholders in enforcing and prosecuting their rights, and has retained counsel who are competent and experienced in litigating derivative actions.

10.     Plaintiff has not made any demand on the present Board of Directors to institute this action against the Individual Defendants for their breach of fiduciary duties as alleged herein because such demand would be a futile and useless act for the following reasons:

(a)     Guidant has pled guilty to ten federal felony counts for making false statements to a federal agency and for the interstate shipment of misbranded devices in connection with this matter.  As of the time of the filing of this case the Justice Department has indicated that it is currently exploring additional criminal charges against top level employees and directors of Guidant.  Accordingly, the present Board of Directors cannot be relied upon to authorize an investigation into their potential criminal misconduct at this juncture.

(b)     As set forth in paragraphs 11 through 56 below, each and every director and the Board of Directors as a whole, knowingly and intentionally failed to act with

4

due care or to exercise their business judgment and acted with conscious indifference to, and in, breach of their fiduciary duties to Guidant and its shareholders.

(c)     A majority of the directors have long affiliations with Dollens and each other through, inter alia, their long service on Guidant's Board and their prior affiliations with each other and Dollens at Eli Lilly and Company.

For these reasons, the Board and each director could neither exercise good faith nor independent objective judgment in deciding whether to bring this action, nor vigorously prosecute this action.

## SUBSTANTIVE ALLEGATIONS

11.     Guidant became a public company in a December 14, 1994, initial public offering. Prior to the public offering, the Company was incorporated in Indiana in September 1994 to be the parent of several of the medical device and diagnostics businesses of Eli Lilly and Company.

12.     Guidant's principal business is the development, manufacturing and marketing of products and services that enable less-invasive treatments for cardiac and vascular patients including stent systems, implantable defibrillator systems, implant able pacemaker systems, implantable cardiac resynchronization therapy, products for the treatment of abdominal aortic aneurysms, products to perform cardiac surgery procedures and intravascular radiotherapy systems for artery disease.

13.     In 1997, Guidant acquired the public company Endovascular for $151,738,144, using approximately 2,697,567 shares of Guidant common stock. Endovascular designs, develops and manufactures minimally invasive endovascular systems to repair diseased or damaged vascular structures.

5

14.     Throughout 1998, Endovascular was developing a product, the ANCURE system, to provide a catheter-based delivery and implantation of a specialized vascular prosthesis to repair abdominal aortic aneurysms which would represent a less invasive alternative to the open surgical procedure that was commonly performed.

15.     As a result of the Company's acquisition of Endovascular, the company distributed the ANCURE system during 1998 in Europe and Australia where it was approved for marketing and continued the FDA application process in the United States.

16.     In March 1999, Guidant submitted a Pre-market Approval (PMA) application for ANCURE to the FDA. In the Company's Form 10-Q for the quarter ending March 31, 1999, the Company announced that its cardiac and vascular surgery product group ("C&VS"), which contributed $20.1 million in revenue and grew annually at 12.3%, was focusing on the ANCURE system. By the quarter ending June 30, 1999, the C&VS group was "primarily focused" on the ANCURE system.

17.     In June 1999, an advisory panel of the FDA unanimously recommended approval of the ANCURE System.

18.     In a September 28, 1999, press release Guidant announced it had received FDA approval to market the ANCURE System for minimally invasive treatment of abdominal aortic aneurysm in the United States, stating, in part:

> Guidant Corporation, a global leader in cardiovascular and vascular therapy, announced today that the U.S. Food and Drug Administration has approved for market release its minimally invasive treatment of abdominal aortic aneurysms (AAA) in the United States. As a result, Guidant is cleared to begin shipping its ANCURE™ System for the minimally invasive treatment of AAA to hospitals throughout the U.S.
>
> This device will provide many of the estimated 1.5 million people afflicted by this life-threatening disease an alternative to the current method of

6

treatment, which is a highly invasive surgical procedure. This FDA approval culminates 10 years of development of a minimally invasive treatment of AAA by Guidant and Endovascular Technologies, which was the first medical device company to successfully perform an endovascular implant in the U.S. in 1993.

\* \* \*

Minimally invasive treatment of AAA represents a significant clinical advance over the traditional surgical procedure. Guidant's clinical data, presented to the FDA, showed that patients implanted with Guidant's device experienced significantly fewer complications than those experienced by persons who underwent conventional surgery. The data also showed that with Guidant's minimally invasive approach to AAA repair, a patient's length of hospital stay was on average only two to three days, compared to six days for persons in the control group who underwent the open surgical procedure.

"Endovascular repair of abdominal aortic aneurysm using the ANCURE System is the most exciting development in the management of patients with AAA since we first developed a way to treat patients with an aneurysm," said Dr. Wesley Moore, professor of vascular surgery at UCLA Medical Center. "It's made a huge difference in terms of patient discomfort and patient acceptance of aneurysm repair.

"We find that the complication rates are lower with the endovascular repair and provide the same benefit with less discomfort, pain and fewer complications."

Studies of the EGS™ System, an earlier generation device that delivers the same implant as the ANCURE System, included 421 EGS patients and 111 who had standard AAA surgery. Blood loss was dramatically lower than in controls, while respiratory and cardiac complications by approximately one half and one third, respectively. The clinical study of the ANCURE System confirmed that the patient benefits from the earlier EGS study were maintained.

Patients who endure the open surgical repair - which prior to today's FDA approval was the only treatment for AAA - typically require a week in the hospital, frequently with two to three days in the intensive care unit. Additionally, several months of home convalescence are required for the patient to fully recuperate. The open surgical repair requires a large incision through the abdominal wall. The patient's internal organs are then moved aside to provide the surgeon access to the aorta, which lies deep within the abdominal cavity. The aorta is then incised, followed by the placement of a surgical graft at the site of the aneurysm.

The ANCURE System differs dramatically from traditional surgical repair due to the fact that it is delivered through the vasculature. The primary components are a delivery catheter and a woven polyester implant. The procedure involves small incisions to two arteries in the groin. The delivery catheter is inserted through one of these arteries, delivering the implant to the site of the aneurysm.

Precisely positioned hooks, a unique feature of the ANCURE System, secure the implant to the vessel wall. This attachment mechanism, combined with ANCURE'S one-piece polyester body, allows the implant to adapt to changes that occur over time in the size and shape of the aorta, while maintaining the implant's original position within this high-pressure artery.

"The ANCURE System represents a quantum leap in the treatment of AAA," said Jay Watkins, president of Guidant's Cardiac & Vascular Surgery Group. "Guidant pioneered the development of this significant alternative to conventional AAA surgery."

"We believe the approval of this device will come as good news to the estimated million and a half people in the United States who have abdominal aortic aneurysm disease. Up until this point, patients with this disease were facing either the prospect of a highly invasive surgical procedure or the unpleasant alternative of taking their chances and waiting for the advent of a better alternative. With the development of the ANCURE System we can offer these patients for the first time, a minimally invasive approach to treating AAA that has fewer complications and requires a shorter hospital stay."

19.    As a condition of FDA approval, Guidant was required to have sales

representatives present in the operating room during each operation that involved the use

of Ancure.

20.    Defendants were aware or are charged with knowledge that under the federal

law, the Safe Medical Devices Act of 1990 ("Devices Act"), Guidant is required to report to

the FDA any incident in which a death, serious injury or a malfunction that may cause

death or serious injury may be attributed to its medical device. These reports are known

as "medical-device reports."

8

21.     Commercial shipments and implants of the Ancure Endograft System ("Ancure"), the new title for the ANCURE system, began in the United States in early October 1999. The Company also announced it had filled 100% of its training capacity for hospitals and physician teams for the rest of 1999, that it would have over 100 hospitals trained by the end of 1999 and an additional 500 hospitals trained during 2000.

22.     Net sales of C&VS products for the nine months ended September 30, 1999, were $40.8 million, a decrease of $9.4 million or 18.7% over the comparable period in 1998, largely due to the liquidation of a C&VS product line unrelated to Ancure. That would be the last quarter in which C&VS did not regularly have U.S. Ancure sales.

23.     Throughout 2000, Guidant exulted the growing sales of Ancure including sales of $7.3 million, $12.1 million, and $18.7 million for the first, second, and third quarters respectively, versus the $2.9 million in sales for the fourth quarter of 1999. Moreover, Guidant updated the investing public with the growing number of vascular surgery centers and physicians that had been trained in the use of Ancure.

24.     In its SEC Form 10-Q for the quarter ended March 31, 2000, filed on May 9, 2000 Guidant stated:

> Sales of Guidant's ANCURE system and accessories were $7.3 million in the first quarter of 2000. Guidant's ANCURE system received FDA approval in September. 1999, providing a less invasive approach for treating AAA. The ANCURE has precisely positioned hooks and a one-piece polyester body that allows the implant to adapt to changes that occur over time within the aorta, while maintaining the implant's original position. Guidant's fourth quarter 1999 revenues from the sale of these products were $2.9 million. Over 350 vascular surgery centers and 700 physicians are now trained in the use of the ANCURE product line.

25.    In June 12, 2000, Guidant issued a press release exalting the safety and

efficacy of Ancure that stated, in part:

Clinical Data Demonstrates Guidant's ANCURE Bifurcated Endograft System for Abdominal Aortic Aneurysms as a Safe and Effective Minimally Invasive Treatment Two years of clinical data demonstrate that Guidant Corporation's ANCURE™ Bifurcated Endograft System is an effective and safe, minimally invasive treatment for abdominal aortic aneurysms (AAA). Results from clinical trials were presented by Wesley Moore, M.D., professor of vascular surgery at UCLA Medical Center, at the Society for Vascular Surgery's 54th annual meeting in Toronto, Canada. The data show Guidant's bifurcated implant to be effective by completely preventing aortic ruptures and decreasing or controlling the size of AAAs in 98 percent of all cases. Approximately two-thirds of patients implanted with the ANCURE device experienced a decrease in aneurysm diameter and nearly one-third of cases resulted in a stabilization of the aneurysm diameter.

Guidant compared its bifurcated endograft to the traditional surgical method of AAA repair. After implanting more than 500 bifurcated endografts since 1995-some with greater than 4 years of follow-up-there were no incidences of ruptures. Additionally, patients who received the minimally invasive treatment lost considerably less blood than recipients of conventional surgery and their respiratory and cardiac complications were reduced by one- half and one-third, respectively. More than 2,000 total bifurcated implants have been performed to date.

*   *   *

"The results of Guidant's latest research on abdominal aortic aneurysms are incredibly encouraging for physicians faced with treating abdominal aortic aneurysms," said Moore. "The data clearly demonstrates the ANCURE System's position as the best-in-class treatment for this life-threatening disease."

Treatment with the ANCURE System requires significantly shorter recovery periods than surgical procedures because the implant is delivered through small incisions to two arteries in the groin. A delivery catheter containing the implant is inserted into one of these arteries and delivered through the patient's vasculature to the site of the aneurysm.

Once inside the patient's body, the ANCURE device's unique positioning hooks secure the implant to the vessel wall. This attachment mechanism, combined with ANCURE'S woven polyester body, allows the implant to adapt

10

to changes that occur over time in the size and shape of the aorta, while maintaining the implant's original position within this high-pressure artery.

26.   In its SEC Form 10-Q for the quarter ended June 30, 2000, filed on August 7,

2000, Guidant stated:

Sales of Guidant's ANCURE system and accessories were $12.1 million in the second quarter of 2000 compared to $7.3 million in the first quarter of 2000. Guidant's ANCURE system received FDA approval in September 1999, providing a less-invasive approach for treating AAA. The ANCURE has precisely positioned hooks and a one-piece polyester body that allows the implant to adapt to changes that occur over time within the aorta, while maintaining the implant's original position. Over 450 vascular surgery centers and 1,000 physicians are now trained in the use of the ANCURE product line. For the six months ended June 30, 2000, ANCURE sales were $19.4 million.

27.   In its SEC Form I0-Q for the quarter ended September 30, 2000, filed on

November 14, 2000, Guidant stated:

Sales growth in both periods was driven by AICDs, the ANCURE®) ENDOGRAFT®) System for endovascular AAA repair, pacemakers, and angioplasty systems.

*   *   *

Sales of Guidant's ANCURE system and accessories were $18.7 million in the third quarter of 2000 compared to $12.1 million in the second quarter of 2000, representing growth of 54.5%. Guidant's ANCURE system received FDA approval in September 1999, providing a less-invasive approach for treating AAA. Three-year follow-up data on the ANCURE system shows that use of the ANCURE system leads to a steadily decreasing aneurysm diameter over time in a majority of patients. The ANCURE has precisely positioned hooks and a one-piece polyester body that allows the implant to adapt to changes that occur over time within the aorta, while maintaining the implant's original position. For the nine months ended September 30, 2000, ANCURE sales were $38.1 million.

28.   In an October 24, 2000, press release, Guidant announced three-year data

on the Ancure System stating, in part:

Three-year follow-up data on Guidant's ANCURE™ System for the treatment of abdominal aortic aneurysm (AAA) shows that use of the ANCURE system

11

leads to a steadily decreasing aneurysm diameter over time in a majority of patients. The data were presented today at the 86th Annual Clinical Congress of the American College of Surgeons by Dr. Michel S. Makaroun in Chicago.

"Endovascular repair of abdominal aortic aneurysm using the ANCURE system is now a viable option for many patients," said Dr. Makaroun, professor of surgery and chief of the division of vascular surgery, University of Pittsburgh Medical Center. "These clinical results are very encouraging because they show stable aneurysm repair at three years, which bodes well for the long-term."

Key findings show:
Guidant's bifurcated implant completely prevented aortic ruptures and decreased or controlled aneurysm size in 96.2 percent of all cases at three years. 73.7 percent of patients with bifurcated implants had a decrease in aneurysm diameter size between discharge and their third annual visit, as compared to 64.8 percent at their second annual visit, and 53.8 percent at their first annual visit. There were no reports of aneurysm rupture with bifurcated implants. Endo Graft migration was observed in only one patient; demonstrating that bifurcated Endografts remain securely attached following implantation.

\*   \*   \*

Guidant compared the ANCURE System to the traditional surgical method of AAA repair. Results from this study contain data from 88 patients implanted with bifurcated ANCURE Grafts who completed three annual follow-up examinations. The diameter of the aneurysm sac was measured by a core laboratory at each follow-up visit to monitor its change in size. Long-term safety data were analyzed using Kaplan-Meier methodology.

After implanting more than 500 bifurcated devices in U.S. clinical trials since 1995, there were no incidences of ruptures. Additionally, patients who were treated with endovascular AAA repair lost considerably less blood than recipients of conventional surgery and their respiratory and cardiac complications were reduced by one-half and one-third, respectively. More than 4,000 bifurcated implants have been performed to date.

"The three-year data for the bifurcated system shows zero ruptures and year-to-year improvement over what was presented earlier this year at the Society of Vascular Surgeons conference," said Jay Watkins, president of Guidant's Cardiac & Vascular Surgery Group. "As awareness of AAA grows among physicians and patients, we're confident that endovascular repair with the ANCURE System will be the treatment of choice for this silent, unrecognized killer."

12

A delivery catheter containing the ANCURE System is inserted into an artery in the groin and delivered through the patient's vasculature to the site of the aneurysm. Once inside the patient's body, the ANCURE device's unique positioning hooks secure the implant to the vessel wall. This attachment mechanism, combined with ANCURE's woven polyester body, allows the implant to adapt to changes that occur over time in the size and shape of the aorta, while maintaining the implant's original position within this high-pressure artery.

The U.S. Food and Drug Administration approved the ANCURE System in September 1999, making this method for endovascular repair available to hospitals throughout the U.S.

29.     However, on March 16, 2001, the Company announced that it voluntarily

halted the production and sales of its ANCURE System as a result of its identification of

certain deficiencies in the Company's ANCURE-related regulatory processes and

communications with the FDA. The company claimed these regulatory deficiencies were

primarily related to the deployment system of the ANCURE product and that the FDA had

been notified of the halt and a meeting had been scheduled with the FDA to discuss these

issues. Moreover, the Company announced that the patients who had previously received

the ANCURE ENDOGRAFT implants were not affected by these actions.

30.     In a March 16, 2001, press release, Guidant announced it had voluntarily

halted production and sales of Ancure, stating:

Guidant Voluntarily Halts Production and Sales of Endovascular Graft
Patients With Implanted Devices Not Affected by this Action
Guidant Corporation today announced it has voluntarily halted production
and sales of its ANCURE® System. The ANCURE System is designed to
provide a less invasive approach than conventional surgery for treating life
threatening abdominal aortic aneurysms (AAA). This action was taken as a
result of Guidant's identification of certain deficiencies in the company's
ANCURE-related regulatory processes and communications with the U.S.
Food and Drug Administration (FDA). These regulatory deficiencies were
primarily related to the deployment system of the ANCURE product. "The

FDA has been notified and a meeting has been scheduled to discuss these issues," said Ron Dollens, president and chief executive officer. "This review is a top priority and we will be doing everything we can to correct the deficiencies and their causes and to resume normal operations as soon as possible."

Patients who have received ANCURE ENDOGRAFT® implants to date are not affected by this action. The safety of the implanted product is supported by extensive positive long-term data. The problems are limited to the regulatory issues associated with the deployment system of the product. As a result, the company does not recommend that physicians take any actions with regard to implanted devices, other than to continue normal follow-up. Existing inventories of product in hospitals will be recalled. Guidant is working closely with the FDA to address all identified deficiencies in order to quickly resume production and availability of the ANCURE system.

Sales of the ANCURE system are approximately 3 percent to 4 percent of Guidant's sales and are a minor contributor to Guidant's overall earnings. The company expects to take a special charge to first quarter earnings of $12 million to $15 million to cover expenses associated with this recall. Excluding this charge, the company is still comfortable with first quarter consensus earnings estimates.

31.    In a March 19, 2001, article titled "Guidant Says Unreported 'Adverse Events'

Prompt Recall on Graft for Aneurysms," *The Wall Street Journal* reported, in part:

Guidant Corp. temporarily halted production and sales of a major product to treat abdominal aortic aneurysms after discovering that its sales people failed to report certain "adverse events" to the Food and Drug Administration.

In an interview, Guidant President and Chief Executive Ronald W. Dollens said the adverse events didn't involve any injuries to patients. Rather, he said, these were difficulties doctors encountered in installing the cylinder-shaped fabric grafts used to repair the aneurysms.

\*   \*   \*

Mr. Dollens said the "adverse events" didn't actually prevent the graft from being installed to repair the patient's aneurysm. He said Guidant discovered on its own that some of its sales staff knew of difficulties doctors had in installing the device, but failed to report these to the federal agency. "This was strictly on our own initiative," and not because of FDA prompting, Mr. Dollens said. He said Guidant executives will be meeting with the federal agency this week.

14

32.   During an April 23, 2001 conference call regarding first quarter 2001

earnings, the Company made the following comment regarding circumstances surrounding

the Ancure halt:

GINGER GRAHAM: Just a couple of things, one is, of course, as we have been out of the market now for a period of time, we do notice there are some centers where they will be looking to reenter the market based on some clarity around the product and the product reentry, so we do believe that there will be some kind of reentry curve coming back in. We have done three things, one is, we obviously still believe we have a very significant product with long-term data that is the best in class, and reinforce that as we continue to gather that data now approaching 4 years. So we think that the product category itself will still be with us, and we will have opportunities to get back into the market with the strongest clinical statement out there. The second thing is that we have gone about putting the information into the FDA [              ] delivery system issues that we have mentioned, and those are current practices, so we won't be reentering the market to teach physicians any different practices. So we think that both are going well. And then the third piece being that we do have other product configurations that is submitted to the FDA, which we think will expand our potential for usage on to a broader variety of patients. So we think all of those are very positive. (omission in original text).

33.   During the time span between FDA approval of Ancure and the Company's

voluntary withdrawal of Ancure, the Company filed 172 medical-device reports with the

FDA.

34.   For the quarter ending March 31, 2001, the Company recorded a $25 million

pretax special charge to first quarter earnings (the "Charge") to account for expenses

associated with the voluntary recall of Ancure and for field actions taken on two unrelated

Guidant products.

15

35.     In its SEC Form 10-Q for the quarter ended March 31, 2001, filed on May 14,

2001, Guidant commented on the Ancure halt and announced it was taking a $25 million

pre-tax charge in part related to the recall, stating, in part:

> Guidant recorded a $25.0 million pre-tax special charge to first quarter earnings to account for expenses associated with a field action related to the first-generation VENTAK®) PRIZM(TM) Implantable Defibrillator and the voluntary recall of the ANCURE®) ENDOGRAFT®) System.

\* \* \*

> Sales of Guidant's ANCURE ENDOGRAFT System and accessories for the treatment of AAA were $17.6 million for the three months ended March 31, 2001, compared to $7.3 million for the three months ended March 31, 2000. In March 2001, the Company voluntarily halted the production of its ANCURE system. Subsequently, the Company performed a voluntary recall and halted sales. These actions were taken as a result of Guidant's identification of certain deficiencies in the Company's ANCURE-related regulatory processes and communications with the FDA, primarily related to the ANCURE deployment system. Patients who have received ANCURE implants to date are not affected by this action as the safety of the implanted product is supported by extensive positive long-term data. Guidant continues to work constructively with the FDA to resolve the regulatory deficiencies previously reported. It is not possible at this time to predict when the product will return to full market availability. Given that uncertainty, it is likely that ANCURE system and accessory sales will be significantly lower in the second quarter of 2001.

36.     On April 27, 2001, the FDA issued a Public Health Notification addressing

"Problems with Endovascular Grafts for Treatment of Abdominal Aortic Aneurysm" that

stated, in part:

> This letter is to inform you about serious problems that have occurred with two endovascular prosthetic graft devices used to treat infrarenal AAA, and to make recommendations concerning their continued use. The two products, both of which were approved for marketing in the U.S. in September 1999, are:

Ancure®Endograft® System (Guidant Endovascular Solutions, Menlo Park,

CA)

This device has a flexible, unsupported fabric graft prosthesis that is actively
fixed in place on the ends by wire hooks that penetrate the vascular tissue.
On 3/16/01, Guidant suspended production and announced a recall of all
existing inventory. The company reported to the FDA that they had failed to
report many device malfunctions and adverse events, including severe
vessel damage associated with problems with the deployment of the device.
There were also manufacturing changes that were not properly reported to
the FDA. The manufacturer told FDA that an internal audit revealed
problems with their complaint handling system, manufacturing quality
systems, documentation procedures and training. The FDA is reviewing the
firm's Corrective Action Plan that addresses these problems. Once we
receive evidence that the firm has appropriately changed their systems and
procedures, and the FDA has reviewed their regulatory submissions, we will
assess whether the product can be returned to the market.

37.    On July 17, 2001, the FDA granted Guidant an investigational device

exemption that allows Ancure implants to resume in a limited clinical manner. The protocol

required the collection of delivery system performance data during the implant procedure,

as well as 30-day patient follow-up. The Company further stated that it continued to work

closely and constructively with the FDA to return Ancure to full market release and was

preparing for such a release in fourth quarter 2001.

38.    In its SEC Form l0-Q for the quarter ended June 30, 2001, filed on August 13,

2001, Guidant stated:

Guidant recorded a $25.0 million pre-tax special charge to first quarter
earnings to account for expenses for a field action related to the first-
generation VENTAK®) PRIZM(TM) Implantable Defibrillator and the
voluntary recall of the ANCURE®) ENDOGRAFT®) System. Management
believes that this amount will be sufficient to fund all expenses related to
these two actions.

*   *   *

17

Sales of Guidant's ANCURE ENDOGRAFT System and accessories for the treatment of abdominal aortic aneurysms were $1.1 million for the three months ended June 30, 2001, compared to $12.1 million for the three months ended June 30, 2000. For the six months ended June 30, 2001, ANCURE sales were $18.7 million compared to $19.4 million during the same period in the prior year. In March 2001, the Company voluntarily halted the production of its ANCURE system and subsequently performed a voluntary recall and halted sales. These actions were taken as a result of Guidant's identification of certain deficiencies in the Company's ANCURE-related regulatory processes and communications with the FDA, primarily related to the ANCURE deployment system. Patients who have received ANCURE implants to date are not affected by this action as the safety of the implanted product is supported by extensive positive long-term data.

In July 2001, the FDA granted Guidant an investigational device exemption that allows implants to resume. The clinical trial protocol provides for 2,000 implants at 300 centers in the U.S. and allows Guidant's ANCURE system to be used to treat patients under informed consent. It requires collection of delivery system performance data during the implant procedure, as well as 30-day patient follow-up. Guidant continues to work closely and constructively with the FDA to return the ANCURE System to full market release as soon as possible. The Company is preparing for full release in the fourth quarter pending FDA approval.

39.     In the Company's SEC Form 10-Q for the quarter ending June 30, 2001, the

Company reiterated the belief that the Charge would be sufficient to fund all expenses

related to these two actions. The Company did not make any new comments regarding the

previously announced FDA communications that commenced after the Ancure recall.

40.     In August 2001 the Company received FDA approval of the required

premarket approval application ("PMA") supplements, which allowed the return to a full

market release of the ANCURE System.

41.     In a press release dated August 17, 2001, Guidant announced  it had

received approval for full market release of Ancure, stating, in part:

Less Invasive Therapy Available to Treat Patients with Abdominal Aortic Aneurysms

18

Guidant Corporation, a world leader in the treatment of cardiac and vascular disease, announced today that it has received approval of the required, PMA supplement filings from the U.S. Food and Drug Administration (FDA), allowing the company to proceed with full market release of the ANCURE® ENDOGRAFT® System. Guidant's ANCURE system is a less invasive method for repair of abdominal aortic aneurysm (AAA).

"We are extremely pleased about beginning the full commercial release of our ANCURE system," said Beverly Huss, president, Endovascular Solutions, Guidant Corporation. "We are prepared to return the ANCURE system to the market this quarter. We also appreciate the FDA's cooperation in working with us to return this important therapy to physicians and patients."

"Guidant's emerging therapies, like ANCURE, will continue to fuel new growth for Guidant going forward-AAA alone represents a billion dollar market opportunity," said Ronald W. Dollens, Guidant president and CEO. "We believe our market release program will position Guidant favorably to begin realizing our previous sales levels within one to two quarters of the ANCURE system's full market release.

42.   In the Company's SEC Form 10-Q for the quarter ending September 30,

2001, the Company sales of endovascular solutions products were $25.2 million for the

third quarter of 2001, compared to $27.2 million in the third quarter of 2000, and reiterated

the sufficiency of the Charge to cover all issues related to the Ancure recall.

43.   In its SEC Form 10-Q for the quarter ended September 30, 2001, filed on

November 14, 2001, Guidant stated:

Guidant recorded a $25.0 million pre-tax special charge to first quarter earnings to account for expenses for a field action related to the first-generation VENTAK®) PRIZM(TM) Implantable Defibrillator and the voluntary recall of the ANCURE®) ENDOGRAFT®) System. Management believes that this amount will be sufficient to fund all expenses related to these two actions.

Sales of endovascular solutions products were $25.2 million for the third quarter of 2001, compared to $27.2 million in the third quarter of 2000. These sales include Guidant's ANCURE®) ENDOGRAFT®) System and

19

accessories for the treatment of abdominal aortic aneurysms as well as peripheral vascular products. Peripheral vascular disease, which is characterized by reduced blood flow to the lower extremities due to atherosclerosis, affects more than 12 million people in North America and Europe, with approximately 600,000 newly diagnosed cases each year. Sales for the third quarter of 2001 were less than the third quarter of 2000 when Guidant had three months of full market release of the ANCURE system. Sales of the ANCURE System were voluntarily halted in March 2001 as a result of Guidant's identification of certain deficiencies in the ANCURE-related regulatory processes and communications with the FDA. In August 2001, the Company received FDA approval of the required PMA supplements, which allowed System. For the nine month product sales were $68.8 million compared to $59.8 million during the same period in the prior year.

44.     In the Company's SEC Form 10-K for the year ending December 31, 2001,

signed by all of the Individual Defendants ("2001 Form 10-K"), filed on arch 21, 2002, the

Company announced it had been served with seven active individual suits and was aware

of the filing of additional suits alleging product liability related causes of action relating to

Ancure. The Company made no new comments regarding any FDA discussions and

reiterated the sufficiency of the Charge to cover all issues related to the Ancure recall.

45.     In the 2001 Form 10-K Guidant stated:

Abdominal Aortic Aneurysms

An abdominal aortic aneurysm (AAA) is an enlargement of the aorta resulting from a weakening of the vessel wall. If untreated, this enlargement can lead to aortic rupture, which in 80% of cases results in death.   ANCURE® ENDOGRAFT® System is designed to allow treatment of AAA through a less-invasive surgery in which the ANCURE device is implanted. The primary physician users of this product currently are vascular surgeons and interventional radiologists.

Sales of the ANCURE System, as a percentage of the Company's total consolidated net sales for the years ended December 31, 2001, 2000 and 1999 were 2%, 2% and less than 1%.

Sales of the ANCURE System were voluntarily halted in March 2001 as a result of Guidant's identification of certain deficiencies in the ANCURE-

20

related regulatory processes and communications with the FDA.  In August 2001, the Company received FDA approval of required PMA supplements, which allowed the return to a full market release.

\* \* \*

New Matters

The Company's sales of the ANCURE System were voluntarily halted in March 2001 as a result of Guidant's identification of certain deficiencies in the ANCURE-related regulatory processes ad communications with the FDA. In August 2001, the Company received FDA approval of required PMA supplements, which allowed the return to a full market release.   The Company has been served with seven active individual suits and is aware of the filing of additional suits alleging product liability related causes of action relating to the ANCURE System.

Sales of Guidant's ANCURE ENDOGRAFT System and accessories for the treatment of abdominal aortic aneurysms totaled $45.6 million for the year ended December 31, 2001, compared to $62.7 million in 2000. Sales of the ANCURE System were voluntarily halted in March 2001 as a result of Guidant' s identification of certain deficiencies in the ANCURE-related regulatory processes and communications with the FDA. In August 2001, the Company received FDA approval of the required PMA supplements, which allowed the return to a full market release of the ANCURE System. Accordingly, 2001 sales reflect seven months of revenues for ANCURE systems and accessories versus twelve months of sales in 2000.

\* \* \*

The Company recorded a $25.0 million pre-tax special charge to first quarter earnings to account for expenses associated with this action and the previously discussed ANCURE voluntary recall. Management believes that this amount will be sufficient to fund recall- related expenses related to these two actions.

46.    In Guidant's SEC Form 10-Q for the quarter ending June 30, 2002, the Company announced that the U.S. Department of Justice ("DOJ") and the Office of Criminal Investigations of the U.S. Food & Drug Administration are conducting an investigation into matters relating to Ancure.

21

47.     In its SEC Form10-Q for the quarter ended June 30, 2002, filed on

August 13, 2002, Guidant also announced that it had become the target of a U.S.

Department of Justice and the Office of Criminal Investigations of the FDA investigation

by stating, in part:

> The Company is aware that the U.S. Department of Justice and the Office
> of Criminal Investigations of the U.S. Food & Drug Administration are
> conducting an investigation into matters relating to the Company's ANCURE
> ENDOGRAFT System for the treatment of abdominal aortic aneurysms. In
> March 2001, the Company voluntarily halted production and sale of the
> product and performed a voluntary recall following the discovery of certain
> regulatory compliance deficiencies in the business unit responsible for the
> sales of the product. The product was returned to full market release in
> August 2001 with FDA approval. The Company is cooperating fully in the
> investigation.

48.     In a sworn statement made on August 13, 2002, defendant Dollens attested

to the accuracy of all SEC Forms filed December 31, 2001, and thereafter in a statement

that provided:

> STATEMENT UNDER OATH OF PRINCIPAL EXECUTIVE OFFICER AND
> PRINCIPAL   FINANCIAL   OFFICER   REGARDING   FACTS   AND
> CIRCUMSTANCES RELATING TO EXCHANGE ACT FILINGS

I, Ronald W. Dollens, state and attest that:

> (1)    To the best of my knowledge, based upon a review of the covered reports of
>        Guidant Corporation (the "Company"), and, except as corrected or
>        supplemented in a subsequent covered report:
>
> -      no covered report contained an untrue statement of a material fact as of the
>        end of the period covered by such report (or in the case of a report on Form
>        8-K or definitive proxy materials, as of the date on which it was filed); and
>
> -      no covered report omitted to state a material fact necessary to make the
>        statements in the covered report, in light of the circumstances under which
>        they were made, not misleading as of the end of the period covered by such
>        report (or in the case of a report on Form 8-K or definitive proxy materials,
>        as of the date on which it was filed).

(2)    I have reviewed the contents of this statement with the Company's audit committee.

(3)    In this statement under oath, each of the following, if filed on or before the date of this statement, is a "covered report":

-    Report of Guidant Corporation on Form 10-K for the year ended December 31, 2001;

-    all reports on Form 10-Q, all reports on Form 8-K and all definitive proxy materials of Guidant Corporation filed with the Commission subsequent to the filing of the Form 10-K identified above; and

-    any amendments to any of the foregoing.

49.    The Company announced in its SEC Form 10-K for the year ending December 31, 2002, that it took an additional $31.9 million charge related to the Ancure investigation by offsetting an unrelated $158.2 million litigation award.

50.    In an April 16, 2003, press release announcing record sales, the Company also announced that it recorded an additional $64.9 million reserve charge in connection with the Ancure investigation, which supplemented the $31.9 million reserve announced in the fourth quarter of 2002. The total reserve for charges in connection with the Ancure investigation was $92 million as of March 31, 2003.

51.    On June 12, 2003, the Company announced the settlement with the Department of Justice with relation to the Ancure investigation, the record payment of $43.4 million and an additional $49 million civil settlement to the government, and the agreement to plead guilty to 10 felony counts. The press release stated:

> EndoVascular Technologies Enters into Settlement with U.S. Department of Justice No Risk to Patients Implanted with ANCURE ENDOGRAFT System.
>
> EndoVascular Technologies, Inc. (EVT), a subsidiary of Guidant Corporation, today announced that it has entered into a settlement agreement with the U.S. Department of Justice into matters relating to the company's

ANCURE® ENDOGRAFT® System for the treatment of abdominal aortic aneurysms (AAA).

Under the terms of the agreement, EVT has agreed to make a payment of $43.4 million and an additional $49 million civil settlement to the government. EVT has also agreed to plead guilty to 10 felony counts, including nine for shipping misbranded products and one count of a former employee making false statements to the government. The expenses associated with this settlement were recorded in prior periods.

Following the company's voluntary recall of the product in March 2001, EVT implemented thorough corrective actions to address certain regulatory compliance deficiencies. The product was reintroduced to the market following Food and Drug Administration approval in August 2001. The issues outlined in the plea agreement pertain only to the delivery system of the ANCURE device prior to the company's voluntary recall, and do not relate to the ANCURE graft once it has been implanted. No patient with the ANCURE ENDOGRAFT implant is at risk as a result of this matter, and the implant continues to demonstrate excellent long-term clinical results. More than 18,000 patients worldwide have been implanted with the ANCURE ENDOGRAFT System.

While the settlement agreement includes a civil payment, the company remains in discussions with the Office of the Inspector General of the U.S. Department of Health and Human Services (HHS) concerning the nature and scope of any potential agreement.

52.     In the plea agreement announced June 12, 2003, the Company admitted that it lied to the government and hid from the public and the government thousands of serious health problems, including 12 deaths, caused by Ancure.

53.     The plea agreement also detailed Guidant's scheme to conceal that Ancure failed to work properly about one of every three times it was used. During the time span between FDA approval of Ancure and the Company's voluntary withdrawal of Ancure from the market on March 16, 2001, the Company filed 172 medical-device reports with the FDA. The Company now admits that there were another 2,628 medical-device reports that it failed to file.  During that time period, 7,632 devices were sold over 19 months.

Consequently, in approximately 36.7% of the operations involving Ancure, there was a medical injury or malfunction related to Ancure.

54.    The plea agreement finally disclosed the extent of the inadequacies in Guidant's Ancure training program as well as the significant flaws in the Ancure product which were known to Guidant at all relevant times. It was finally revealed that the flaw related to the Ancure System's equipment becoming lodged in the blood vessel potentially requiring emergency surgery to remove it. In other instances, on the advice of Guidant sales representatives, the equipment was broken into pieces before withdrawal.

55.    The Company notified the FDA in March 2001 of cases in which its sales personnel hadn't notified the agency yet did not disclose such information to the investing public. Government officials first became aware of defendants covering- up in October 2000 when a group of anonymous employees wrote a letter to the FDA.

56.    The Company is still in discussions with the Office of the Inspector General of the U.S. Department of Health and Human Services concerning the nature and scope of any potential agreement so that Heath and Human Services will not seek to bar the Company from any government programs. Furthermore,   Endovascular agreed to cooperate in an investigation against executives who might have been involved in the wrongdoing by, inter alia, waiving the attorney-client privilege.

### COUNT I

### (Derivative Claim Against All Defendants
### for Breach of Fiduciary Duty)

57.    Plaintiff realleges and incorporates by reference each and every allegation contained above.

25

58.     The Individual Defendants are fiduciaries of the Company and of all of its public stockholders and owe to them the duty to conduct the business of the Company loyally, in good faith, carefully, diligently and prudently.  This cause of action is asserted based upon the Individual Defendants' acts in violation of applicable state law and common law, which acts constitute breaches of fiduciary duties.

59.     The Individual Defendants breached their fiduciary duty, including the duty of care to Guidant and its shareholders, by not only failing to act as an ordinarily prudent person would have acted in a like position but also by acting with gross recklessness and in conscious disregard of their responsibilities to act on the interests of Guidant.

60.     As a result of the Individual Defendants' wrongful conduct and actions, Guidant has suffered and will continue to suffer considerable damage.

61.     The Individual Defendants, singly and in concert, engaged in the aforesaid conduct in the intentional breach and/or reckless disregard of their fiduciary duties to the Company and conspired to, and did  abuse the control vested in them by virtue of their high-level positions in the Company.

62.     By reason of the foregoing, the Individual Defendants have breached their fiduciary duties to Guidant and its shareholders.

63.     Guidant and its stockholders have been injured by reason of the Individual Defendants' intentional and/or reckless disregard of their fiduciary duties to Guidant.

## COUNT II

### (Derivative Claim Against All Defendants For Contribution)

64.     Plaintiff realleges and incorporates by reference each and every allegation contained above.

26

65.     To the extent that Guidant is liable to pay damages relating to any of the federal securities class actions filed against the Company, plaintiff seeks contribution on behalf of Guidant for such amounts.

## DAMAGES SUSTAINED BY GUIDANT

66.     The Individual Defendants' breach of fiduciary duties has caused Guidant to incur millions of dollars in damages and has had, and will continue to have, devastating effects on the Company, as detailed above.  Plaintiff seeks contribution on behalf of Guidant for such damages.

**WHEREFORE**, plaintiff demands relief on behalf of Guidant as follows:

A.     Judgments against each of the Individual Defendants for restitution, contribution, indemnification and/or damages in favor of plaintiff, on behalf of Guidant and its public stockholders, and awarding punitive and exemplary damages as appropriate, plus pre judgment interest;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, so as to assure that plaintiff and Guidant have an effective remedy;

C.     An award to plaintiff of the costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

D.     An award to plaintiff of such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all such issues which are triable before a jury.

27

Dated: 8/11/03

**COHEN & MALAD, LLP**

**BY:** _____

Irwin B. Levin
Richard N. Bell
Richard E. Shevitz
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: 317-636-6481
Facsimile: 317-636-2593


**BERNSTEIN, LIEBHARD &
LIFSHITZ, LLP
SANDY A. LIEBHARD
U. SETH OTTENSOSER**
10 East 40th Street
New York, N.Y. 10016
Telephone (212) 779-1414

Attorneys for Plaintiff

## VERIFICATION

I, Seth Ottensoser, hereby declare as follows:

1.     I am a member of the law firm of Bernstein Liebhard & Lifshitz, LLP, counsel for plaintiff in the above titled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.     I make this Verification because plaintiff is absent from the County of New York where I maintain my office.

Executed this 11th day of August, 2003 at New York, New York

SETH OTTENSOSER